## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| **ANTHONY BOUKNIGHT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 06-2118 (RMU)** |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** | ) | |
| **(D.C. FIRE and EMS DEPARTMENT)** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO DISTRICT OF COLUMBIA'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

**COMES NOW**, Plaintiff Anthony Bouknight, by and through Donna Williams Rucker, Esquire, and the law firm of DUBOFF & ASSOCIATES, CHARTERED, in opposition to Defendant District of Columbia's Motion to Dismiss or, Alternatively for Summary Judgment, and in support therefore, states as follows:

1.    Defendant has failed to establish that it is entitled to summary judgment.

2.    Plaintiff was subjected to an adverse action when he was transferred to another unit as well as when he was subjected to a nine-day suspension without pay.

3.    There exists genuine issues of fact material to this case and the Defendant is not entitled to judgment as a matter of law.

4.    Plaintiff did allege that he was subjected to a hostile environment and this allegation was in fact investigated as evidenced in the Letter of Determination issued by the D.C. Office of Human Rights ("OHR") and attached as Exhibit 9.

5.      Plaintiff will voluntarily dismiss, without prejudice, his claims as to Retaliation. Plaintiff has a Retaliation claim pending before the D.C. Office of Human Rights and a decision has not yet issued.

6.      Plaintiff will voluntarily dismiss, without prejudice, the Counts alleging Intentional Infliction of Emotional Distress and Negligence.  Plaintiff agrees with the defendant that this claim is subsumed in his claim for race discrimination.  Plaintiff will likewise, dismiss, without prejudice the Counts in his Amended Complaint that allege Negligent Hiring and Negligent Supervision.

7.      This case is not brought solely under the D.C. Human Rights Act, it is also filed under and Title VII of the Civil Rights Act.  As for the allegations raised in this matter, plaintiff did not send a 12-309 Notice to the District.  As regards plaintiff's reprisal claim, plaintiff has served the District of Columbia a Notice pursuant to 12-309.

8.      Plaintiff's position in opposition is more fully set forth in the accompanying Memorandum of Points and Authorities incorporated herein by reference.

7.      Plaintiff's Statement of Material Facts in Dispute and a Proposed Order are attached hereto.

**WHEREFORE**, plaintiff respectfully requests that defendant District of Columbia's Motion to Dismiss or, Alternatively, for Summary Judgment be denied and for such other and further relief as deemed just and proper.

Respectfully submitted,

By:      _____/s/_____
Donna Williams Rucker, 446713
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road., Suite 501
Silver Spring, Maryland 20910
(o) (301) 495 –3131/ (f) (301) 587-1872

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| **ANTHONY BOUKNIGHT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 06-2118 (RMU)** |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** | ) | |
| **(D.C. FIRE and EMS DEPARTMENT)** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DISTRICT OF COLUMBIA'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

Plaintiff, Anthony Bouknight, by and through counsel, pursuant to LCvR 7(b), hereby submits, in opposition to Defendant District of Columbia's Motion to Dismiss or, Alternatively, for Summary Judgment, the following Memorandum of Points and Authorities in Opposition to the Motion to Dismiss or, Alternatively, for Summary Judgment as follows:

1.  Plaintiff will voluntarily dismiss, without prejudice, his claims as to Retaliation, Negligence, Negligent Hiring and Negligent Supervision.

2.  Defendant has failed to establish that it is entitled to judgment as a matter of law.

3.  Plaintiff has asserted a *prima facie* case for race discrimination.

4.  Plaintiff was subjected to an adverse action when he was transferred to another unit and subjected to a nine-day suspension without pay.

5.  Defendant is responsible for its failure to properly investigate and/or promptly correct the racial discrimination that plaintiff was subjected to in the work place.

## I.    <u>FACTS</u>

Plaintiff filed the above captioned Complaint on or about December 13, 2006. An Amended Complaint was filed on or about January 26, 2007.  Plaintiff is African-American (Black) (Amended Complaint ¶ 30.)  Plaintiff alleges that he was subjected to adverse employment action, including being suspended for nine (9) days based on his race.  (Amended Complaint ¶ 32.)  The adverse employment actions plaintiff was subject to were taken solely because of his race. (Amended Complaint ¶ 33 and Exhibits 2-4.)

In December of 1991 the District of Columbia Government (Fire and EMS Department) hired plaintiff as a Paramedic. (Amended Complaint ¶ 6.)  At all relevant times the Defendant employed Plaintiff as a Paramedic.  (Amended Complaint ¶ 7.)  On August 6, 2006, Plaintiff and his partner, Paramedic Matthew Shook, were dispatched to 3800 Reservoir Road, N.W., Washington, D.C. with the event type "Conscious with Abnormal Breathing." (Amended Complaint ¶ 8 and Exhibit 5.)

On the date of the incident Paramedic Shook was in charge of patient care while Plaintiff Bouknight was the driver of the medic unit. (Amended Complaint ¶ 10.)  Plaintiff checked with Paramedic Shook, who was in the back of the unit supposedly working on the patient obtaining vitals, and Shook indicated that he was okay with the patient and that they could proceed to the emergency room. (Amended Complaint ¶ 12 and Exhibit 6.)  Plaintiff transported the patient and her mother to the emergency room at Georgetown University Hospital.  Plaintiff exited the unit and assisted the patient's mother in getting out of the unit.  By the time Plaintiff made his way around to the back of the unit, he saw that Paramedic Shook had the patient and was already entering the emergency room doors. (Amended Complaint ¶ 13.)  Paramedic Shook entered the Emergency Room with the patient and Plaintiff went into the back of the unit, as required, and

prepared it for the next patient. (Amended Complaint ¶ 14.)  When Plaintiff and Paramedic

Shook returned to the firehouse Plaintiff observed Paramedic Shook make the required journal

entry regarding their run. (Amended Complaint ¶ 16.)

On August 22, 2005 Plaintiff and Paramedic Shook were instructed to report to their

Captain's office, Captain Hattie Tompkins.  (Amended Complaint ¶ 17.)  Once arriving at the

Captain's office Plaintiff and Paramedic Shook were shown a complaint letter ("Letter") from

the patient's mother regarding the August 6, 2005 run to Georgetown University Hospital

("Run"). (Amended Complaint ¶18.)

On August 30, 2006 Captain Tompkins ordered Plaintiff to report to her office to discuss

the August 6, 2005 Run. (Amended Complaint ¶ 20.)  Plaintiff requested that a Union

Representative be present and the meeting was rescheduled. (Amended Complaint ¶ 21.)  When

Plaintiff was again called to the Captain's office on August 30, 2005, Plaintiff asked where the

Union Representative was and he was told by Captain Tompkins and another supervisor that they

just wanted to talk about the August 6, 2005 Run and he really did not need a Union

Representative. (Amended Complaint ¶ 22.)  Plaintiff was informed that no disciplinary action

would be taken as a result of anything discussed on August 30, 2005. (Amended Complaint ¶

23.)  Immediately after the discussion on August 30, 2005 Plaintiff was informed that effective

September 4, 2005 he and his partner, Paramedic Shook were being transferred from their

assignment on Medic 1 and were being sent to separate units. (Amended Complaint ¶ 24.)

Approximately one week later, Captain Tompkins informed Plaintiff that he had been

transferred because he is Black and she, the Captain, is Black and that Paramedic Shook is White

and that although Plaintiff had done nothing wrong, he was being transferred because he is

Black. (Amended Complaint ¶ 25 and Exhibits 2-4.)  Plaintiff objected to being singled out

solely because of his race and he requested that no action be taken against him because he had done nothing wrong. (Amended Complaint ¶ 26.)

On October 1, 2005, Captain Tompkins recommended that Plaintiff be suspended from work for "Inefficient; to wit: Negligent or careless work performance." (Amended Complaint ¶ 27.) Plaintiff was subsequently suspended for nine calendar days, and threatened with other disciplinary action. (Amended Complaint ¶ 28 and Exhibit 7.)

Due to the adverse treatment Plaintiff has been subjected to, he has suffered, embarrassment, humiliation, pain and suffering, including emotional distress. Plaintiff has sustained damages and/or injuries that are permanent in nature. (Amended Complaint ¶ 41.).

Contrary to defendant's assertions in its Motion, plaintiff did allege facts regarding a hostile work environment. Allegations of the same are acknowledged by the OHR in Exhibit 9. The D.C. Office of Human Rights investigated plaintiff's claims, and a probable cause determinations issued as regards plaintiff's claim of race discrimination. (Exhibit 9).

## II.     STANDARD OF REVIEW

### Dismissal

When considering a Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) the Court accepts as true all of the complaint's factual allegations *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged" *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994).

"The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Wallace,* 1998 D.C. App.

LEXIS 9, at *9; *McBryde v. Amoco Oil Co.,* 4040 A.2d 200, 203 (D.C. 1979).    In addition, all ambiguities must be resolved in plaintiff's favor.  *See Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards,* 680 A.2d 419, 430 (D.C. 1996).  Given these considerations, "unless it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," a pleading should not be dismissed.  *Id.*

## Summary Judgment

Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d. 202, 106 S. Ct. 2505 (1986).  In deciding a motion for summary judgment the district court is obligated to view the available evidence in the light most favorable to the nonmoving party.  *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Popham, Haik, Schnobrich, Kaufman & Dotty, Ltd. V. Newcomb Securities Co.*, 243 U.S. App. D.C.  43, 751 F.2d 1262, 1263 (D.C. Cir. 1985) ("any doubt is to be resolved against the moving party").  In *Anderson*, the Supreme Court made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

The moving party bears the burden of demonstrating the absence of any genuine issue of material facts.  *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Richardson v National Rifle Association,* 871 F. Supp. 499 (D.D.C. 1994).  The defendant is thus entitled to summary judgment only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Id.*

The Court's threshold inquiry is whether there are "any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury <u>might</u>  (emphasis added) return a verdict in his favor.  If he does so, there is a genuine issue of fact that requires trial." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (emphasis added).

## III.    <u>PROVING DISCRIMINATION AS A MATTER OF LAW</u>

The basic test for presentation of proof and the burden of persuasion in a discrimination case has been laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). First, the plaintiff has the burden of proving by a preponderance of evidence a *prima facie case* of discrimination.  Second, if plaintiff has successfully completed step one, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employee's rejection.  Finally, the plaintiff is then given an opportunity to prove that the assertions put forth by the defendant in step two were actually a pretext for discrimination. *McDonnell Douglas Corp.,* at 804; *Texas Dep't of Community Affairs,* at 253.

## IV.    <u>ARGUMENT</u>

### A.    <u>Plaintiff has established a *prima facie* case of discrimination.</u>

An allegation of disparate treatment is analyzed under the three-step process articulated in *McDonnell Douglas Corp v. Green* 411 U.S. 792 (1973).  A plaintiff must first establish a *prima facie* case by presenting some evidence sufficient to infer that unlawful discrimination took place.  411 U.S. at 802.  The employer must then provide a rebuttal by submitting evidence of a legitimate, nondiscriminatory reason for its action.  If is does so, the plaintiff must prove by

a preponderance of the evidence that the reason is a pretext for discrimination, *Id* at 804; *see also St Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).  To prove pretext, a plaintiff must produce testimony or documentary evidence establishing either that discriminatory animus is the more likely explanation for the defendant's action or that the defendant's stated reason lacks credibility and that discrimination is the true reason.   See *Hicks*, 509 U.S. at 514-515.

In this case, the defendant argues that plaintiff has failed to establish a *prima facie* case of discrimination based on race.  But, the facts show that Plaintiff's transfer to another unit was based solely on the fact that Plaintiff is Black.  Captain Tompkins informed Plaintiff, and other members of the Fire Department, that plaintiff was being transferred because he was Black. (Exhibits 2-4.)  Further Plaintiff was ultimately suspended without pay for nine days for the alleged incident on August 6, 2005. (Exhibit 7)

Plaintiff has established that Defendant, by and through the actions of its employees, supervisors, servants, and/or employees, specifically Captain Tompkins, did subject Plaintiff to discrimination based on his race.  Defendant is responsible for Captain Tompkins based on the theory of *Respondeat Superior*, in that Captain Tompkins was Plaintiff's supervisor, and Captain Tompkins was acting as an agent for their employer in the course and scope of her employment with the District of Columbia Fire and EMS Department.  Defendant caused Plaintiff to incur a tangible loss when he was transferred to another medic unit, which caused a great amount of stress and inconvenience because the shift change upset the family schedule, and when plaintiff was suspended  for nine days without pay.

Defendant District of Columbia will not be able to meet its burden of establishing that it exercised reasonable care to prevent and correct promptly any racially discriminating behavior that was created by plaintiff's supervisor, Captain Tompkins.

**B.**    **Defendant has failed to articulate a legitimate non-discriminatory reason for its actions**

If plaintiff establishes a *prima facie* case of discrimination and/or retaliation, the burden then is on the defendant to articulate a legitimate, non-discriminatory reason for its challenged actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253-54; *McDonnell Douglas*, 411 U.S. at 802.

Plaintiff followed all of the Defendant's protocols for a driver during the August 6, 2005 run in question. All protocols that were allegedly violated by the Plaintiff were duties that Defendant's Order Book assigns to the person operating as crewmember, not the driver. On the day in question, plaintiff was the driver; Paramedic Shook was the crewmember. The evidence in this case will reveal that Captain Tompkins did not believe that plaintiff's deserved to be reassigned or suspended; her decision to do so was based on plaintiff's race.

**C.**    **Plaintiff suffered an adverse action**

An adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities, i.e. hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, such that a reasonable trier of fact could conclude that the employee suffered objectively tangible harm. *Burlington Industries, Inc v. Ellerth*, 524 U.S. 742, 761; *Brown v. Brody*, 199 F.3rd 446, 457 (D.C. Cir. 1999). Adverse personnel actions must have some negative consequences with respect to the employee's employment. *Stewart v. Evans*, 275 F.3d 1126, 1135-1136 (D.C. 2002).

Plaintiff suffered an adverse action when Defendant transferred him to another medic unit and subsequently suspended him for nine days without pay. When plaintiff filed his initial complaint with the Office of Human Rights ("OHR"), he wanted to include the proposed

suspension in his complaint, but he was told that he had to wait until he was "actually suspended". Plaintiff also presented claims of hostile work environment. By the definitions in *Burlington*, Plaintiff's transfer and suspension are adverse actions, since the transfer affected overtime potential, and the suspension, without pay, clearly affects the terms, conditions, or privileges thereof, causing Plaintiff a tangible harm.

**D.    Defendant is not entitled to Dismissal of the Complaint**

When considering a Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) the Court accepts as true all of the complaint's factual allegations *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged" *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994).

"The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Wallace,* 1998 D.C.App. LEXIS 9, at *9; *McBryde v. Amoco Oil Co.,* 4040 A.2d 200, 203 (D.C. 1979).

Based upon the foregoing, plaintiff respectfully requests that the Defendant's Motion to Dismiss be denied.

**E.    Defendant is not entitled to Summary Judgment.**

In deciding a motion for summary judgment the court is obligated to view the available evidence in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Popham, Haik, Schnobrich, Kaufman & Dotty, Ltd. V. Newcomb Securities Co.*, 243 U.S. App. D.C.  43, 751 F.2d 1262, 1263 (D.C. Cir. 1985) ("any doubt is to be resolved against the moving party"). In *Anderson*, the Supreme Court

made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Plaintiff has shown a *prima facie* case of retaliation under Title VII of the Civil Rights Act of 1964, as amended. Plaintiff has further shown that the reasons offered by the defendant for the reprisal plaintiff suffered are mere pretext.

The moving party bears the burden of demonstrating the absence of any genuine issue of material facts. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Richardson v National Rifle Association,* 871 F. Supp. 499 (D.D.C. 1994). Plaintiff Has presented evidence that he lost nine days of pay, and he was transferred to another unit because of his race.

The Court's threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury **might** return a verdict in his favor. If he does so, there is a genuine issue of fact that requires trial." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (emphasis added).

Under a Rule 56 analysis, defendant's motion must fail as plaintiff has adequately stated claims upon which relief can be granted. The decision to suspend Plaintiff for nine-days without pay was motivated by discrimination based on Plaintiff's race and should properly be considered by a trier of fact and not disposed of on a Motion for Summary Judgment.

VI.   **CONCLUSION**

Based on the foregoing, plaintiff has established a *prima facie* case of discrimination based on his race, and there were complaints made that could be evidence of a hostile work environment.  Plaintiff has presented evidence of disputed facts that are material to this case, and the defendant has failed to establish that they are entitled to judgment as a matter of law.

Based upon the evidence in this case, a jury could find that the plaintiff was subjected to discrimination based on his race and the he suffered an adverse employment action.  Given the evidence in this matter, and it should be noted that discovery has not yet occurred, a jury could find that defendant's articulated reasons for its actions are not worthy of credence.  The documentary evidence presented raises at least a question as to the credence to be given to the defendant's bear assertions in response to plaintiff's allegations. When all facts asserted in this case are viewed in a light most favorable to plaintiff, defendant's Motion to Dismiss, or Alternatively, for Summary Judgment should be denied.

At this juncture we should not be trying to weigh the evidence and determine the truth of the matter but only determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**WHEREFORE**, based on the foregoing, plaintiff Anthony Bouknight respectfully requests that this Honorable Court deny defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.

Respectfully submitted,

By:      _____/s/_____
Donna Williams Rucker, 446713
DuBoff & Associates, Chartered
8401 Colesville Road., Suite 501
Silver Spring, Maryland 20910
(301) 495 –3131 Office  (301) 587-1872  Fax

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

| | | |
|---|---|---|
| **ANTHONY BOUKNIGHT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 06-2118 (RMU)** |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** | ) | |
| **(D.C. FIRE and EMS DEPARTMENT)** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to F.R.C.P 56, the Plaintiff submits the following statement of Material Facts in Dispute, in support of Plaintiff's Opposition to Defendant District of Columbia's Motion to Dismiss or, Alternatively, for Summary Judgment:

1.    Plaintiff was transferred to another medic unit solely because of his race. (Exhibits 2-4)

2.    Plaintiff was suspended for nine days, without pay solely because of his race. (Exhibits 2-4)

3.    Plaintiff suffered an adverse employment action when he was transferred from Medic 1 to another medic unit.

4.    Plaintiff suffered an adverse employment action when he was suspended for nine days, without pay.

5.    Plaintiff as the driver was not responsible for direct patient care during the August 6, 2005 run to 3800 Reservoir Road, N.W., Washington, D.C. (Exhibit 6 and 8)

6.    Plaintiff's partner, Paramedic Shook, as the crewmember was responsible for direct patient care during the August 6, 2005 run to 3800 Reservoir Road, N.W., Washington,

D.C. (Exhibit 8).

      7.     Plaintiff did allege a hostile work environment before the OHR.  (Exhibit 9)

      8.     Captain Tompkins recommended plaintiff be suspended and this was based upon his race.  (Exhibit 1, 9).

      9.     Captain Tompkins told at least three (3) other Fire Department employees that she was aware that Plaintiff did nothing wrong.  (Exhibits 2, 3, 4).

      10.     That Captain Tompkins recommended that plaintiff's shift be changed based upon his race. (Exhibits 2, 3, 4, 9).

      11.     That plaintiff was subjected to a hostile work environment.  (Exhibit 1).

      12.     Plaintiff was subjected to discrimination based upon his race. (Exhibit 1, 9).

Respectfully submitted,

By: _____/s/_____
Donna Williams Rucker, Esquire
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road, Ste. 501
Silver Spring, Maryland 20910
(301) 495-3131    Office
(301) 587-1872    Facsimile

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **ANTHONY BOUKNIGHT** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.: 06-2118 (RMU)** |
| **v.** ) | |
| ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** ) | |
| **(D.C. FIRE and EMS DEPARTMENT)** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF'S EXHIBIT LIST

1.   Amended Complaint.

2.   Notarized Letter from La'Kisha L. Lacey.

3.   Notarized Letter from Charles L. Cloud.

4.   Letter from LaTisha Porter.

5.   Event Information for Run on August 6, 2005.

6.   Bouknight Memorandum date August 22, 2006.

7.   Decision Notice/Suspension dated January 18, 2006.

8.   Administrative and Operational Rules pages 7 and 8.

9.   Letter of Determination from the D.C. Office of Human Rights, dated June 13, 2006.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

ANTHONY BOUKNIGHT )
1618 Winesapp Drive )
Odenton, Maryland 21113 )
)
     **Plaintiff,** )
)     **Case No.: 1:06-cv-2118**
    **v.** )     **Judge Urbina**
)
DISTRICT OF COLUMBIA GOVERNMENT )
(D.C. FIRE AND EMS DEPARTMENT) )
)
Serve: Honorable Anthony Williams, )
     or designated representative )
     District of Columbia Government )
     1350 Pennsylvania Avenue N.W. )
     Washington, D.C. 20004 )
)
Serve: Office of the Attorney General )
     for the District of Columbia )
     441 4th Street N.W. 6th Floor South )
     Washington, D.C. 20001 )
)
)
     **Defendant.** )

## AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

    **COMES NOW,** the Plaintiff, Anthony Bouknight, by and through his attorney, Donna

Williams Rucker, Esquire and DUBOFF AND ASSOCIATES CHARTERED, and files suit against the

District of Columbia Government, Fire and EMS Department, and for cause of action states as

follows:

### JURISDICTION AND VENUE

    1.    Jurisdiction of the Court is proper pursuant 42 U.S.C. §§ 2000(e) et seq., §1981 of

the Civil Rights Act, and Title VII of the Civil Rights Act of 1964, and the District of Columbia

Human Rights Act of 1977.



PLAINTIFF'S
EXHIBIT
*1*

2.    Venue is appropriate and based on the fact that the actions complained of are the result of actions and employment practices of Defendant occurring within the District of Columbia.

3.    Plaintiff Anthony Bouknight ("Bouknight") has exhausted his administrative remedies and timely files this action pursuant to the right to sue letter attached as Exhibit A.

4.    Plaintiff brings this action for discrimination on the basis of race (African-American).

## FACTS

5.    Plaintiff incorporates all information and allegations contained in the foregoing paragraphs as if fully set forth herein.

6.    Plaintiff was hired by the Defendant as a Paramedic in December of 1991.

7.    Plaintiff at all relevant times was a Paramedic employed by the Defendant.

8.    On August 6, 2006, Plaintiff and his partner, Paramedic Matthew Shook, were dispatched to 3800 Reservoir Road, N.W., Washington, D.C. with the event type "Conscious with Abnormal Breathing."

9.    Upon arriving at the scene, an engine company, turned care of the patient over to the Plaintiff and his partner, Paramedic Shook.

10.   On the date of the incident Paramedic Shook was in charge of patient care while Plaintiff Bouknight was the driver of the medic unit.

11.   Plaintiff assisted the patient's mother into the front passenger seat.

12.   Plaintiff checked with Paramedic Shook, who was in the back of the unit supposedly working on the patient obtaining vitals, and Shook indicated that he was okay with the patient and that they could proceed to the emergency room.

13.     Plaintiff transported the patient and her mother to the emergency room at Georgetown University Hospital.  Plaintiff exited the unit and assisted the patient's mother in getting out of the unit.  By the time Plaintiff made his way around to the back of the unit, he saw that Paramedic Shook had the patient and was already entering the emergency room doors.

14.     Paramedic Shook entered the Emergency Room with the patient and Plaintiff went into the back of the unit and prepared it for the next patient.

15.     Once Paramedic Shook returned to the unit Plaintiff proceeded back in service.

16.     When Plaintiff and Paramedic Shook returned to the firehouse Plaintiff observed Paramedic Shook make the required journal entry regarding their run.

17.     On August 22, 2005 Plaintiff and Paramedic Shook were instructed to report to their Captain's office, Captain Hattie Thompkins.

18.     Once arriving at the Captain's office on August 22, 2005 Plaintiff and Paramedic Shook were shown a complaint letter ("Letter") from the patient's mother regarding the August 6, 2005 run to Georgetown University Hospital ("Run").

19.     Plaintiff provided a special report to the allegations made in the Letter as instructed by Captain Thompkins in the August 22, 2005 meeting.

20.     On August 30, 2006 Captain Thompkins ordered Plaintiff to report to her office to discuss the August 6, 2005 Run .

21.     Plaintiff requested that a Union Representative be present and the meeting was rescheduled.

22.     When Plaintiff was again called to the Captain's office on August 30, 2005, Plaintiff asked where the Union Representative was and he was told by Captain Thompkins and another supervisor that they just wanted to talk about the August 6, 2005 Run and he really did

not need a Union Representative.

23.    Plaintiff was informed that no disciplinary action would be taken as a result of anything discussed on August 30, 2005.

24.    Immediately after the discussion on August 30, 2005 Plaintiff was informed that effective September 4, 2005 he and his partner, Paramedic Shook were being transferred from their assignment on Medic 1 and were being sent to separate units.

25.    Approximately one week later, Captain Thompkins informed Plaintiff that he had been transferred because he is Black and she ,the Captain, is Black and that Paramedic Shook is White and that although Plaintiff had done nothing wrong, he was being transferred because he is Black.

26.    Plaintiff objected to being singled out solely because of his race and he requested that no action be taken against him because he had done nothing wrong.

27.    On October 1, 2005, Captain Thompkins recommended that Plaintiff be suspended from work for "Inefficient; to wit: Negligent or careless work performance."

28.    Plaintiff was subsequently suspended for nine calendar days, and threatened with other disciplinary action.

### COUNT I
### DISCRIMINATION
### (Race and Reprisal )

29.    Plaintiff incorporates all information and allegations contained in the foregoing paragraphs as if fully set forth herein.

30.    Plaintiff is African-American, and is a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended.

31.    Plaintiff performed his job duties satisfactorily.

32.    Plaintiff was nonetheless subjected to adverse employment action, including being suspended for nine (9) days.

33.    The adverse employment actions plaintiff was subject to were taken solely because of his race, and caused plaintiff to experience harassment.

34.    Plaintiff has also been harassed and subjected to acts of reprisal, that have had an adverse effect on plaintiff, for filing an EEO complaint.

35.    Plaintiff's race played a motivating role and/or contributed to defendant's decision to take the action taken against plaintiff.

36.    Plaintiff has been discriminated against based upon his race and reprisal; he was singled out and disciplined solely because of his race. Plaintiff has been treated differently and subjected to different terms and/or conditions of employment as well as a hostile work environment, and reprisal due to his race.

37.    The Defendant is responsible for the actions of its employees, including Captain Thompkins, under the doctrine of *Respondeat Superior*.

38.    Defendant has failed to address a pattern and practice of discrimination in the work place that Plaintiff has been subjected to.

39.    Plaintiff has received differential treatment, has been subjected to adverse employment actions and disparaging treatment from his supervisors based on his race and in reprisal for filing an EEO complaint.

40.    Plaintiff has been subjected to harassment and adverse employment action. Specifically he was suspended for nine days, and he has been threatened with other disciplinary action, and suspensions.

41.    Due to the adverse treatment, and the hostile work environment Plaintiff has been subjected to, he has suffered, embarrassment, humiliation, pain and suffering, including emotional distress. Plaintiff has sustained damages and/or injuries that are permanent in nature.

42.    Plaintiff has also incurred lost wages, medical bills and costs, and other related expenses.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.    Award compensatory and punitive damages in excess of Five Hundred Thousand Dollars ($500,000.00);

b.    Award, pursuant to 42 U.S.C. Section 2000(e)-(5)(k), reasonable attorney's fees and costs incurred and for this action; and

c.    Equitable, Declaratory and injunctive relief;

d.    Award such other and further relief as this Court deems just and proper.

## COUNT II
### (Intentional Infliction of Emotional Distress)

43.    Plaintiff incorporates all information and allegations contained in the foregoing paragraphs as if fully set forth herein.

44.    The actions of the Defendant by and through its employees were extreme and outrageous conduct.

45.    Defendant by and through its employees committed the discrimination intentionally and caused Plaintiff severe emotional distress and embarrassment.

46.    Defendant by and through its employees should have known that their behavior would have the probable consequences of causing Plaintiff severe emotional and psychological distress.

47.    Defendant's actions did in fact cause Plaintiff great emotional and psychological distress, humiliation, embarrassment and pain and suffering.  Plaintiff was required to seek medical assistance, care and treatment.

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

a.    Award compensatory and punitive damages in excess of Five Hundred Thousand Dollars ($500,000.00);

6

b.          Award, pursuant to 42 U.S.C. Section 2000(e)-(5)(k), reasonable attorney's fees and costs incurred and for this action; and

c.          Equitable, Declaratory and injunctive relief;

d.          Award such other and further relief as this Court deems just and proper.

## COUNT III
### (Negligence )

48.     Plaintiff incorporates all information and allegations contained in the foregoing paragraphs as if fully set forth herein.

49.     Defendant owed Plaintiff the duty to allow him to work in an environment free of discrimination, and a hostile work environment.

50.     As a result of the Defendants negligence, the Plaintiff, has in the past and will in the future experience, pain and suffering, humiliation, embarrassment, emotional distress, and mental anguish.

51.     The Defendant was negligent, by and through its employees, in that it breached the applicable standard of care owed to Plaintiff.

52.     The above negligent acts and/or omissions by Captain Thompkins, directly and proximately caused significant injuries and losses, economic and non-economic, to the Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.          Award compensatory and punitive damages in excess of Five Hundred Thousand Dollars ($500,000.00);

b.          Award, pursuant to 42 U.S.C. Section 2000(e)-(5)(k), reasonable attorney's fees and costs incurred and for this action; and

c.          Equitable, Declaratory and injunctive relief;

d.          Award such other and further relief as this Court deems just and proper.

<u>**COUNT IV**</u>
**(Negligent Hiring and Negligent Supervision)**

53.     Plaintiff incorporates all information and allegations contained in the foregoing paragraphs as if fully set forth herein.

54.     At all times relevant to the instant action, Captain Thompkins was an employee of this Defendant and at the time of the occurrence, was acting within the course and scope of her employment.

55.     Defendant knew or should have known that responsible employees, including Captain Thompkins, were not adequately fit for hire for the duties they were to carry out and that in the course of their promotions within the Fire and EMS Department that there was behavior that indicted that their work and actions should be properly supervised.

56.     Defendant knew or should have known that Captain Thompkins required supervision at the times and based on the circumstances relevant to this case and defendant failed to provide said supervision.

57.     Defendant knew or should have known at the time of hiring Captain Thompkins and/or after observing her in the performance of her duties, that she was unfit to fulfill the duties and obligations of her position, and that she would not take proper measures regarding the performance of her duties and obligations of her job as required by the rules, policies and procedures then in effect.

58.     Defendant had a duty to refrain from hiring Captain Thompkins and/or to properly supervise Captain Thompkins in the performance of the duties and obligations required of her job, and to not retain Captain Thompkins when her performance revealed that she was not properly performing her duties.

59.     As a direct and proximate result of the negligence of the Defendant by and through its employees, plaintiff suffered pain and injuries, mental anguish, has incurred other related costs, without any negligence whatsoever contributing thereto on the part of the Plaintiff.

60.     As employer and/or principal of Captain Thompkins, Defendant under the doctrine of *Respondeat Superior*, is responsible for the negligent acts its employees perform in the course and scope of their employment.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.     Award compensatory and punitive damages in excess of Five Hundred Thousand Dollars ($500,000.00);

b.     Award, pursuant to 42 U.S.C. Section 2000(e)-(5)(k), reasonable attorney's fees and costs incurred and for this action; and

c.     Equitable, Declaratory and injunctive relief;

d.     Award such other and further relief as this Court deems just and proper.

## COUNT V
### (Equitable Relief )

61.     The allegations contained in paragraphs 1 through 60 are incorporated herein by reference as if fully pleaded herein.

62.     Plaintiff seeks to have the Fire & EMS Department cease and desist all discriminatory practices;

63.     Plaintiff seeks to have removed from his personal, and other files maintained by defendant, any negative information and/or disciplinary action taken against plaintiff as a result of the actions complained of herein.

64.     Plaintiff seeks to have the defendant take all disciplinary action required by its rules, policies and procedures against all responsible management officials.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

      a.      Award compensatory and punitive damages in excess of Five Hundred Thousand Dollars ($500,000.00);

      b.      Award, pursuant to 42 U.S.C. Section 2000(e)-(5)(k), reasonable attorney's fees and costs incurred and for this action; and

      e.      Equitable, Declaratory and injunctive relief;

      f.      Award such other and further relief as this Court deems just and proper.

Respectfully submitted,

By:   _____

Donna Williams Rucker, Esquire
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road, Suite 501
Silver Spring, Maryland 20910
(301) 495-3131     Office
(301) 587-1872     Facsimile

## JURY DEMAND

Plaintiff requests a jury trial on all issues in this case.

_____

Donna Williams Rucker

February 10, 2006

To Whom It May Concern:

This letter is being written on behalf of Mr. Anthony Bouknight. I La'Kisha L. Lacey while working night work on Medic 24 was having a conversation with Chief Supervisor Capt. Hattie Tompkins who was working overtime as EMS 4-5, I cannot recall the exact date that this occurred, but I am positive of what was said directly to me by Capt Tompkins " I know Bouknight didn't do anything wrong but I moved him Because I did not want Paramedic Shook to say I moved him and not Bouknight and then have Shook file an EEO complaint.

La'Kisha L Lacey

EDWARD LEE MORGAN, SR.
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 2008

FEB 1 0 2006

**PLAINTIFF'S EXHIBIT**
2

January 17,2006

Charles Cloud
Chief Shop Steward
AFGE local 3721

To Whom It May Concern:

In September of 2005 while in the Emergency Room of Greater Southeast Hospital I was approached by Paramedic Anthony J Bouknight, he stated to me that he was having a problem with Captain Hattie Tompkins in that she removed him from his assigned unit of Medic 1 after she received a complaint regarding Mr Bouknight and Paramedic Matthew Shook. He asked if I could go and talk to Captain Tompkins because he felt that he had done nothing that would warrant his removal from Medic 1, later on that day I spoke with Captain Tompkins and inquired about Paramedic Bouknight situation when she stated that he was not going back to that unit because "she was not going to deal with that racial mess" and that if she moved Bouknight back Paramedic Shook would file a discrimination complaint even though she agreed that Paramedic Bouknight had done nothing wrong.

*Charles L. Cloud*

*[signature]*

1/17/06

EDWARD LEE MORGAN, SR.
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 2008

*[signature]*

JAN 17 2006

PLAINTIFF'S
EXHIBIT
3

# LaTisha Porter
# 4304 South capitol St. #
# 3 Washington DC 20032

September 30,2005

Paramedic Bow knight

Dear Sir or Madam:

On September 28,2005 I LaTisha Porter was ordered to Engine 16 by Captain Hattie Thompkins & Chief Gregory Blalock to type a special report. While there I witnessed a conversation and comments made by Captain Thompkins About Paramedic Bow knight and paramedic shook. Captain Thompkins was on the phone speaking very loudly to another employee about Paramedic Bow knight and Paramedic Shook situation.

. Captain Thompins Stated" No!!! I'm not going to send Bow knight back to medic 1.She said I know it's not his fault but have you looked at my color and his color.  If I send him back to medic 1 than shook will file EEO and I don't want any charges on me.

Captain Thompkins stated" you know that boy shook has got a lawyer and I don't want him saying that I allowed Bow knight to go back and not him because he's white and Bow knight is black.  After she got off the phone Captain Thompkins and I (Latisha porter) began a conversation and she repeated it again.

 Captain Thomkins" stated that she was scared that if she sent Paramedic Bow knight back to medic 1 Paramedic shook would file charges against her She made reference to a situation between my self and another employee on our job I LaTisha Porter Stated that's not right you'll shouldn't do people like that Captain Thomkins said that she's a at will employee and she would do whatever they tell her Speaking about Chief Blalock.





PLAINTIFF'S EXHIBIT
4

# Event Information -- F050094465

| Location Information | | Caller Information | |
|---|---|---|---|
| Number | 3800 | Name | GEORGETOWN UNIVERSITY |
| Direction | | Address | 3700 O ST NW |
| Street | RESERVOIR | Phone | 202-687-0100 |
| Type | RD | Terminal | d23 |
| Suffix | NW | Calltaker ID | 201299 |
| Area | | Source | ANI/ALI |
| Municipality | DC | Remarks | SPECIAL ADDRESS COMMENT: |
| Apartment | | | EMER. RM. PH# 202-784-2119 |
| X-Street 1 | 38TH ST NW | | CB# 2026874343 :PUA |
| X-Street 2 | 39TH ST NW | | IN THE REAR |
| Date | 8/6/2005 | Case Numbers | |
| Event Type | 13C02 -- DIA- CONSCIOUS WITH ABNORMAL BREATHING | Disp Codes | IC |

| Agency | P | Esz | Area | DGroup | Add | Dispatch | Arrive | Close | Cls ID | Cls Term | Event | Comments | Prim Unit | Situation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCFEMS | 1 | 99999 | FIRE | EMS | 11:00:54 PM | 11:01:11 PM | 11:06:35 PM | 11:19:41 PM | | $M01 | F050094465 | | E05 | |

| Details | Chronology | Unit | Supplemental |
|---|---|---|---|

**PLAINTIFF'S EXHIBIT 5**

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## FIRE AND EMERGENCY MEDICAL SERVICES DEPARTMENT
### WASHINGTON, D.C. 20001



## MEMORANDUM

**TO:**      Adrian H Thompson
             Fire Chief

**FROM:**    Anthony J Bouknight
             Paramedic

**DATE:**    August 22, 2005

**SUBJECT:** Incident #94465

---

On the evening of August 6, 2005 I was the driver of M-1 on the above incident, upon our arrival the patient was being walked to the unit by the crew of E-5 who assisted the patient in getting into the rear of the medic unit, my partner was Paramedic Matthew Shook who was providing patient care, and indicated that he was ok with the patient and I could proceed to Georgetown ER. I said hello to the mother and assisted her in getting into the passenger seat, during this brief encounter I had no conversation with either the patient or the mother.

PLAINTIFF'S
EXHIBIT

6

GOVERNMENT OF THE DISTRICT OF COLUMBIA
FIRE AND EMERGENCY MEDICAL SERVICES DEPARTMENT
WASHINGTON, D.C. 20001



JAN 1 8 2006

Anthony Bouknight
Paramedic
D.C. Fire and Emergency
Medical Services Department
1923 Vermont Avenue, NW
Washington, D.C. 2001

Re.: Decision Notice/Suspension
Case No.: C-05-95

Dear Mr. Bouknight:

This is a notice of final decision in follow-up to the proposal to suspend you without pay for fifteen (15) calendar days, from your position of Paramedic, with the D.C. Fire and Emergency Medical Services Department, as specified in the advance notice of proposal dated November 15, 2005, that was served to you for the following cause:

<u>Failure to follow protocols</u>

The reasons, specifically and in detail, were set forth in the proposed letter, which you acknowledged receipt on November 18, 2005. In that letter you were informed of your rights to review any material upon which the proposed action was based and to respond in writing within six (6) calendar days from receipt of the written notice. You requested and were granted an extension until December 7, 2005. You submitted a response dated December 7, 2005. I have given full and careful consideration to the evidence of record the facts as stated in the letter of proposal and your response.

**FINAL AGENCY DECISION**

After a thorough review of all documents pertaining to your case, I find that the cause cited in the letter of proposal is supported by a preponderance of the evidence but a lesser penalty is warranted. Therefore, it is my decision to reduce the proposed penalty to a nine (9) calendar day suspension without pay.

According to Bulletin No. 11 Section III Miscellaneous Rules members in a non-pay status for disciplinary reason (AWOL, Suspension or LWOP), shall not be eligible to work overtime until the first day of the pay period after the conclusion of the non-pay status.

Accordingly, you will be suspended without pay for nine (9) calendar days effective at 0700 hours February 11, 2006, through 0700 hours February 20, 2006. You will return to a duty status on February 20, 2006, at 0700 hours.



PLAINTIFF'S
EXHIBIT
7

Re.: Decision Notice/Suspension
   Case No.: C-05-95
   A. Bouknight

As the District of Columbia Fire and Emergency Medical Services Department recognizes the American Federation of Government Employees, Local 3721 as the representative of its collective bargaining employees, you are hereby advised of the right to grieve this action through Article 31 of the Negotiated Grievance Procedure within ten (10) working days of the effective date of your suspension.

You may contact your union representative of your local for additional information regarding the grievance procedures.

The disciplinary grievance, should you prepare one, must be presented, to Assistant Fire Chief William M. FitzGerald, at 1923 Vermont Avenue NW, 2nd floor Washington, DC 20001. Chief FitzGerald may be reached at (202) 673-3320.

The decision on a disciplinary grievance shall be issued in writing no longer than 30 workdays from the date that the grievance is filed. A decision denying the grievance, in whole or in part, shall be the final administrative decision, which is not subject to further administrative appeal.

For additional information on the appropriate procedures for the submission of the disciplinary grievance, you may contact the Office of Compliance at (202) 673-3333.

Sincerely,

Gregory D. Blalock
Deputy Chief, Operations
Emergency Medical Services Department

XXIV-7

**A.    Driver (Position No. 1):**

    1.    Checks the vehicle exterior compartments for accountable equipment.

    2.    Checks for any <u>new</u> exterior body damage.

    3.    Checks electrical system to include warning lights, siren and radios.

    4.    Checks all oxygen levels and fill as needed (Minimum 500 psi).

    5.    Checks all vehicle fluid levels. Report fluids needed to the company officer and document in the unit journal.

    6.    Checks equipment and Medical Supply lockers following the replenishment of supplies on the unit.

    7.    Document the findings of the inspection in the unit journal and associated sections of the FD Forms 54.2 AMB and 54.3.

**B.    Crewmember (Position No. 2):**

    1.    Checks the patient compartment area and associated equipment of the unit.

    2.    Makes journal entry of members assuming duty with all appropriate accountable equipment (PPE, PAT and credentials).  Document accountable property received from off-duty shift (Fuel key/cards, unit keys & portable radios).

    3.    Checks for any <u>new</u> interior damage to vehicle and/or equipment.

    4.    Makes the journal entries for *all assigned incidents,* to include the incident number, in/out times (regardless of whether the call was canceled, reassigned or placed in service by the fire unit on scene). Incidents that include *transports* will also include the patient's name, sex, age, transport code and receiving hospital in the incident journal entry.

    5.    Ensures that the executed EMS 151-c Run Sheets are delivered to the appropriate drop site (Engine Cos. 2; 8; 12; 16; 20; 24; 30; 32).

    6.    Checks rundown in company rundown book for the next tour of duty.

    7.    Document the findings of the inspection in the unit journal and associated sections of the FD Forms 54.2 AMB and 54.3.

**C.    Position Responsibilities Continued - Medical Duties:**

The following itemized checklist shall be addressed upon assuming duty each tour of duty.  The positions are identified as driver and crewmember, and should be rotated each twelve (12) hours and each tour of duty at a minimum.

**PLAINTIFF'S EXHIBIT**

8

XXIV-8

**Driver (Position No. 1):**

1.    Equipment Carried on Calls:

    a.  AED.
    b.  Airway Kit or Suction.
    c.  Portable Radio.

2.    Duties at the Incident Scene:

    a.  Applies Oxygen and AED, when applicable.
    b.  Obtains Vital Signs.
    c.  Establishes IV Line, when applicable.
    d.  Checks the scene for equipment prior to leaving the scene.

3.    Duties at the Hospital:

    a.  Restocks the unit and clean all equipment used on the scene.
    b.  **Clear the hospital – Return to service – as quickly as possible.**  The maximum time allowed at the hospital is 30 minutes for BLS units and 45 minutes for ALS units. Additional time can be requested from Communications Division – in twenty (20) minute increments – on an as needed basis only!!

**Crewmember (Position No. 2):**

1.    Equipment on Calls:

    a.  Jump Bag.
    b.  Portable Oxygen.
    c.  Portable Radio.

2.    Duties at the Incident Scene:

    a.  Stays with the patient from the initial on-scene contact to release at the hospital.
    b.  Obtains patient history and pertinent information from the patient, family and/or bystanders at the scene.
    c.  Determines how the patient will be treated and transported.  Request additional resources as may be necessary.
    d.  Administers medications, as needed.
    e.  Reassesses the patient's condition prior to and during transport.
    f.  Checks the scene for equipment and any discarded material that would be classified as medical waste prior to leaving the scene.

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Office of Human Rights



Judiciary Square Office
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559  Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559  Fax: (202) 645-6390

## LETTER OF DETERMINATION

June 13, 2006

Anthony Bouknight
c/o Donna Williams Rucker
DuBoff & Associates, Chtd.
8401 Colesville Road
Silver Spring, Maryland 20910

Reference:   ***Anthony Bouknight v. DC Fire & EMS***
             **Docket No.: 06-073-DC(CN)**
             **EEOC No.: 10CA600065**

Dear Mr. Bouknight:

The Office of Human Rights ("the OHR") has completed the investigation of the above referenced complaint. You are referred to as **"COMPLAINANT."** DC Fire and EMS ("FEMS") is referred to as **"RESPONDENT."**

### ISSUE PRESENTED

Whether Respondent subjected Complainant to disparate treatment on the basis of his race (Black): 1) When Respondent transferred Complainant from Medic 1 to another assignment; 2) When one of Complainant's supervisors allegedly threatened Complainant; and 3) When Respondent placed Complainant on a 9-day suspension without pay.

### JURISDICTION

Respondent is the local government agency that provides fire and emergency medical services for the District of Columbia. The alleged acts of discrimination occurred in the District of Columbia, and Respondent is not exempt for any known reason from the laws of the District prohibiting unlawful discrimination. Therefore, Respondent is subject to the enforcement jurisdiction of the OHR.


PLAINTIFF'S
EXHIBIT
9

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 2 of 12

## FINDINGS OF FACT

The OHR's investigation of this matter included a review of the original complaint and an amendment, Respondent's Position Statement, Complainant's Rebuttal, and witness interviews.

In the Charge of Discrimination filed on December 5, 2005, Complainant indicated that Respondent hired him as a Paramedic in December 1991.

Complainant averred that on August 22, 2005, he and his partner (White) were instructed to report to their Captain's office. Once there, the Captain (Black) showed them a complaint letter that a citizen had filed with Respondent regarding Complainant and his partner. The person who wrote the letter alleged that at approximately 11:00 p.m. on August 6, 2005, her adult daughter had mistakenly administered 21 units of what she thought was her nighttime (long acting) insulin. However, she had actually injected 21 units of short-acting insulin, which is taken before meals. The short-acting insulin injected was four to seven times the normal dose. Since there was a danger that her daughter would go into life threatening insulin shock, the mother called 911.

An engine company was the first unit on the scene in response to the emergency call. When Complainant and his partner arrived in their ambulance (Medic 1) a short time later, the engine company turned the patient over to their care. In her letter to Respondent, the patient's mother alleged that the paramedics, Complainant and his partner, seemed confused as to why they were called since a hospital emergency room was literally within walking distance for the patient and her mother. According to the mother's complaint, the paramedics allegedly indicated that if the mother and daughter had walked to the emergency room, they would have been there before the ambulance had arrived. The mother felt that the paramedics did not comprehend the seriousness of her daughter's situation.

As instructed by his Captain at the August 22, 2005 meeting, Complainant provided a written response to the allegations made by the patient's mother. Complainant wrote that he had been the ambulance driver on the night of the incident. Members of the engine company walked the patient to the ambulance once it arrived on the scene. Complainant wrote that he checked with his partner, who was providing patient care, and was told that he was okay with the patient and that they could proceed to the emergency room. Complainant assisted the mother to the passenger seat, and indicated that he had no conversation with either the patient or her mother during the short trip to the hospital – the hospital was located on the same block as the hotel to which Medic 1 had been dispatched to pick up the patient and her mother.[1]

---

[1] The OHR record contains a copy of the written statement that Complainant's partner submitted to Respondent on the same date, August 22, 2005. Complainant's partner wrote: "The persons who wrote the complaint were never told to walk over to the Emergency Room. I simply stated that they could have done so if they had wished and would have arrived at the E.R. before we had." Later in his statement,

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 3 of 12

## Transfer from Medic 1

About a week later, on August 30, 2005, the Captain once again instructed Complainant
to report to her office to discuss the August 6, 2005 incident. Complainant proffers that
he told the Captain that since he had already submitted his written report, he had concerns
about discussing the matter further without a union representative being present.
Complainant indicates that he agreed to the meeting after the Captain assured him that a
union representative would be present when they met, and he requested that the Captain
call him when the union representative arrived.

Sometime between 12:00 and 1:00 a.m., the Captain instructed Complainant to report to
her office, which he did. Contrary to the Captain's assurances, a union representative
was not present. When Complainant asked about this, the Captain responded that she and
another supervisor, a lieutenant (White), just wanted to talk to him about the August 6,
2005 run. The Captain told Complainant that no disciplinary action would be taken as a
result of their discussion of the incident. With that understanding, Complainant agreed to
continue with the meeting.

After this meeting, Complainant and his partner were informed that, effective September
4, 2005, they were being transferred from their assignment on Medic 1 and were being
sent to separate units. Complainant alleges that about a week later, the Captain told him
that he had been transferred because he is Black and she is Black and his partner is white.
According to Complainant, the Captain continued that although she knew that he had
done nothing wrong, it would not look right if she did not transfer Complainant when she
transferred his partner.

Complainant had submitted a signed and sworn statement for the OHR record from the
Chief Shop Steward (Black) of the union local. In that statement, the Chief Shop
Steward wrote, "[Complainant] asked if I could go and talk to [the Captain] because he
felt that he had done nothing that would warrant his removal from Medic 1. Later on that
day I spoke with [the Captain] and inquired about [Complainant's] situation. She stated
that he was not going back to that unit because 'she was not going to deal with that racial
mess' and that if she moved [Complainant] back [his partner] would file a discrimination
complaint even though she agreed that [Complainant] had done nothing wrong."

An OHR investigator interviewed the Chief Shop Steward -- he indicated that he had
provided Complainant with the written statement referred to above. Furthermore, the
witness told the investigator that he had spoken to the Captain on two occasions
concerning the Complainant – once on the telephone and once in person, and that she had
made the same statement both times. The witness explained to the investigator that he
had talked to the Captain because Complainant wanted to return to his assignment on
Medic 1, and that the Captain had told him that she had moved Complainant because she

---

Complainant's partner wrote: "In addition, the "patient" is 32 years old. I question the validity of a 32
year-old needing her mother to write a complaint for her."

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 4 of 12

did not want it to appear that her decision to transfer Complainant's partner had been racially motivated -- Complainant's partner was White and both Complainant and the Captain were Black. He continued that the Captain did not want it said that she did not move the Black employee, but moved the White employee. When the investigator specifically asked the Chief Shop Steward if the Captain had stated that Complainant had done nothing wrong on the August 6, 2005 run, he answered in the affirmative.

Complainant also presented a signed statement from one of Respondent's employees (Black) who allegedly heard the Captain talking on the telephone about Complainant's transfer.[2] In a written statement, the employee indicated that she heard the Captain make the following statements while talking on the telephone: "No! I'm not going to send [Complainant] back to Medic 1. She said I know it's not his fault, but have you looked at my color and his color. If I send him back to Medic 1 than (sic) [Complainant's partner] will file EEO and I don't want charges on me." In the last paragraph of her statement, the employee wrote, "[The Captain] stated that she was scared that if she sent [Complainant] back to Medic 1 [Complainant's partner] would file charges against her…"

When interviewed by an OHR investigator, the Captain said that it was during the August 22, 2005 meeting with Complainant and his partner that she became aware that the two paramedics had not followed Respondent's established policies on the night of August 6, 2005. Since she believed that they were both responsible for the procedural failures, she transferred both to different units.

The Captain also told the investigator that she did not recall having a conversation with the Chief Shop Steward regarding her decision to transfer Complainant. She did recall telling the Chief Shop Steward, at some point, that she could not make a decision on what to do regarding Complainant until the investigation was over. The witness added that she never made a reference to "that racial mess." Finally, the Captain insisted that the employee who alleged that she overheard the Captain refer to Complainant's transfer in a telephone conversation had nothing to do with this incident. Furthermore, the Captain denied ever discussing Complainant's transfer with this employee.

Although the Captain said that after the August 6, 2005 incident, she viewed both paramedics as a "liability" to Respondent's agency, she did not recommend that either of them be terminated. Her recommendation had been that both Complainant and his partner be suspended for not following Respondent's procedures and protocols on the night of August 6, 2005.[3] Complainant's partner was eventually terminated for abandoning his position. According to the Captain, Complainant's partner thought that Respondent was going to terminate him for the August 6, 2005 incident, so he did not return to work.

---

[2] An OHR investigator made several attempts to contact this employee, but she did not respond to messages requesting that she contact the investigator at the OHR.

[3] There is evidence in the OHR record that the Captain, on October 1, 2005, recommended that Complainant be suspended for ten (10) days for "Inefficiency; to wit: Negligent or careless work performance."

Finally, the Captain alleged that Complainant had publicly said to her, "I'm going to run you out of here."

One of Respondent's lieutenants (White), who was also present at the August 30, 2005 meeting, was interviewed by an OHR investigator. The lieutenant proffered that one paramedic was in charge of Medic 1 on paper, but that both paramedics were equally responsible for patient care. The Order Book, according to the lieutenant, mostly defines responsibilities for the ambulance, its supplies, and equipment. He emphasized, however, that patient care begins as soon as the paramedics arrive on the scene, and that both crewmembers are equally responsible for that care.

## Supervisory Threats

Complainant also alleges that one of his supervisors (White), a lieutenant,[4] had threatened him in the Training Academy parking lot by saying, "You may think it's over, but I'm going to get your black ass out of here." Complainant avers that the lieutenant was determined to have him removed from his position of Paramedic.

One of Complainant's witnesses indicated that the lieutenant had a tendency of harassing a lot of people from the time that he was promoted. The witness said that in his opinion, the lieutenant seemed to be harder on Blacks than Whites. To explain his meaning, he gave the following example: if the lieutenant saw Black paramedics doing something wrong, he would yell at them; however, if he saw White paramedics doing the exact same thing, he would go over and talk to them saying something like, "Come on guys, let's get this done."

When interviewed by an OHR investigator, the lieutenant said that the incident in the Training Academy parking lot had not occurred as recounted by Complainant. According to the lieutenant, Complainant approached him as he was unloading some classroom materials from the back seat of his personal vehicle in the Training Academy parking lot. Upon approaching, Complainant asked him, "Do you have a problem with me?" The lieutenant avers that he answered, "No, [Complainant], I don't have a problem with you. Do you have a problem with me?" At that point Complainant answered that he (Complainant) had kids, and that the lieutenant had better watch what he was doing. The lieutenant responded, "If you keep up that shit, you'll be out of here."

## Suspension Without Pay

There is documentary evidence in the OHR record, a letter dated January 18, 2006, which indicates that Respondent suspended Complainant for nine calendar days for failing to

---

[4] This is the same lieutenant who was present at Complainant's August 30, 2005 meeting with the Captain, and whose interview with an OHR investigator is referred to above.

follow its protocols on August 6, 2005.[5] Complainant alleges that the suspension, just as the earlier transfer, was discriminatory. He proffers that although he had done nothing wrong, as his Captain had allegedly admitted to his witness, he was suspended because of his race.

Respondent contends that its "General Patient Care Protocols" clearly indicate that Complainant, as the senior paramedic on Medic 1, was ultimately responsible for patient care, even though his partner was in the back of the ambulance with the patient while Complainant was driving the unit. Those protocols state: "The provider with the highest level of pre-hospital training and seniority will be in charge of patient care." (Page A 1.5) Respondent charged Complainant with the following protocol violations: not taking the patient's vital signs, which would have taken approximately three minutes;[6] not checking the patient's blood sugar level, which would have taken approximately one minute; not performing a patient assessment; not completing a patient care report; and not leaving a patient care report with the triage nurse in the Emergency Room.

In his rebuttal, Complainant proffered that paramedics' duties were also defined and governed by the "Order Book," which sets forth rules and procedures for Respondent's paramedics. The Order Book, in Section 2 (Position Responsibilities), clearly delineates the duties and responsibilities for paramedics assigned to an ambulance, separating them into those duties which pertain to the driver and those which pertain to the paramedic in the back of the unit (identified as the "crewmember"). Complainant proffers that the Order Book identifies the crewmember, not the driver, as being responsible for all aspects of patient care.[7] On page XXIV-8, under Crewmember (Position No. 2), the Order Book states the following:

"Duties at the Incident Scene:
  a. Stays with the patient from the initial on-scene contact to release at the hospital.
  b. Obtains patient history and pertinent information from patient, family and/or bystanders at the scene.
  c. Determines how the patient will be treated and transported. Request additional resources as may be necessary.
  d. Administers medications, as needed.
  e. Reassesses the patient's condition prior to and during transport.

---

[5] On November 15, 2005, Respondent had proposed that Complainant be suspended for fifteen (15) calendar days, but the deciding official reduced the suspension to nine (9) calendar days.
[6] Although Complainant asserts that the patient's vital signs had already been taken by the engine company that arrived on the scene before Medic 1, both Respondent and Complainant's witnesses indicated that Medic 1 was required to take the vital signs upon assuming care of the patient from the engine company.
[7] Complainant's witness, the Chief Shop Steward, supported Complainant's contention. The witness alleged that although Respondent often cited the "General Patient Care Protocols" when it formally charged its employees with protocol infractions, it was the "Order Book" that dictated actual day to day operational procedures. In fact, the witness proffered that approximately a year ago the Chief had clearly stated that he expected the procedures in the Order Book to be followed by ambulance crews.

      f.  Checks the scene for equipment and any discarded material that would be classified as medical waste prior to leaving the scene."

Complainant notes that during the incident in question, Complainant was the driver and his partner was the crewmember. Therefore, Complainant proffers that there was no justification to cite him for the patient care procedural failures listed in Respondent's charging document and final decision, which resulted in his suspension without pay for nine (9) calendar days.

## STANDARD OF REVIEW

In this forum, in order for Complainant to prevail, the OHR's record must contain credible, probative and substantial evidence from which a reasonable person could conclude that Complainant met the *prima facie* elements of discriminatory or retaliatory behavior, and that a legitimate, nondiscriminatory explanation for the behavior does not exist. 4 DCMR § 715.1; 4 DCMR § 499.1.

## LEGAL ANALYSIS

In a case brought under the DCHRA, the same three-part test applicable to Title VII cases applies. *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986). The initial burden is on the employee to prove his *prima facie* case of discrimination. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C. 1993*); see Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). If the employee satisfies his burden, he raises a rebuttable presumption that the employer's conduct is unlawful discrimination. *Arthur Young*, 631 A.2d at 361. After this rebuttable presumption is raised, the employer must then articulate "some legitimate, nondiscriminatory reason for the employment action." *Atlantic Richfield*, 515 A.2d at 1099 (citing *Burdine*, 450 U.S. at 254). The employer can "satisfy its burden by producing admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus." *Atlantic Richfield*, 515 A.2d at 1099-1100. The employer need not persuade the "[trier of fact] that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.

If the employer articulates a legitimate, nondiscriminatory reason for the employment action, "the burden shifts back to the employee to prove…that the employer's stated justification for its action 'was not its true reason but was in fact merely a pretext' to disguise discriminatory practice." *Arthur Young*, 631 A.2d at 361 (citation omitted). "This burden merges with the ultimate burden of persuasion on the question of intentional discrimination." *Atlantic Richfield*, 515 A.2d at 1100. "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)(quoting *Burdine*, 450 U.S. at 253).

Thus, once the employer satisfies its burden of producing a nondiscriminatory reason for its action, the employee must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515 (emphasis in original). That the proffered reason for that action was based on a mistake, or misinformation is irrelevant as long as the employer believed, in good faith, the underlying facts impacting its decision. *Hollins v. Federal National Mortgage* Association, 760 A.2d 563, 573-574 (D.C. 2000). While pretext in the proffered reason for the employment action may, "in appropriate circumstances" justify an "inference" of discrimination, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), a Plaintiff is never relieved of the burden of proving "that the employer has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514.

Guided by the Supreme Court's analysis in *McDonnell Douglas*, the elements of a *prima facie* case of race discrimination are: (1) Complainant is in the protected classes; (2) Complainant was qualified for his position and met the legitimate expectations of his employer; (3) Complainant suffered an adverse action going to material terms, conditions and privileges of his employment; and (4) Complainant's race was a substantial factor in the adverse action. *McDonnell Douglas, Inc. v. Green,* 411 U.S. 792, 802 (1973); *St. Mary's Honor Center*, 509 U.S. at 506; *Arthur Young v. Sutherland*, 631 A.2d at 361.

An adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities, i.e. hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, such that a reasonable trier of fact could conclude that the employee suffered objectively tangible harm. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761; *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). Minor changes in work related duties, unless accompanied by some other adverse change in the terms, conditions or privileges of employment, are not sufficient to establish an adverse action. False accusations, public humiliation, or loss of reputation constitute an adverse action only if they result in adverse changes in the terms, conditions or privileges of employment. Formal criticism or reprimands, without additional disciplinary action such as a change in grade, salary or other benefits, are not adverse employment actions. Adverse personnel actions must have some negative consequences with respect to the employee's employment. *Stewart v. Evans*, 275 F.3d 1126, 1135-1136 (D.C. 2002).

Complainant can establish that race (Black) was a "substantial factor" in Respondent's discrimination against him by showing that "similarly situated" employees outside his protected classes were treated differently. *Atlantic Richfield v. District of Columbia Office of Human Rights,* 748 A.2d 949 (D.C. 1986*); McManus v. MCI,* 748 A.2d 949 (D.C. 2000*); Hollins v. Federal National Mortgage,* 760 A.2d 563 (2000). The precise elements in a *prima facie* case will be determined by the nature of the alleged discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, n.13 (1973).

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 9 of 12

## Respondent Did Not Discriminate Against Complainant on the Basis of His Race (Black) When It Transferred Him From Medic 1 And When His Supervisor Allegedly Threatened Him.

The OHR finds that Complainant has satisfied the first element of his *prima facie* case under the DCHRA. He is a member of a protected class by virtue of his race (Black).

The OHR is not persuaded by Respondent's argument that Complainant did not meet its legitimate expectations on August 6, 2005 because he failed to follow its patient care protocols. All of the protocols that Respondent alleges were violated in its November 15, 2005 proposal to suspend Complainant, are duties which Respondent's Order Book assigns to the crewmember, not the driver. Nowhere does Respondent indicate that Complainant failed to perform any of the duties or responsibilities specifically assigned to the driver in the Order Book. Although Complainant's supervisor, a lieutenant, alleged to an OHR investigator that he had had performance issues with Complainant prior to the August 6, 2005 incident, the lieutenant did not proffer what those performance issues were and indicated that they had not been documented. Therefore, the OHR finds that Complainant establishes the second element.

However, Complainant fails to show that Respondent subjected him to an adverse action, as defined by the DCHRA, when it transferred him from Medic 1 to another ambulance unit. Although he was reassigned, he had essentially the same paramedic responsibilities in the new assignment as he had on Medic 1. Thus, he does not establish that he suffered an adverse action.

Nor does Complaint establish that he suffered an adverse action when his lieutenant, on one occasion, allegedly made the statement, "You think its over but I'm going to get your black ass out of here." Although Complainant alleges in a written statement, dated May 2, 2006, that the lieutenant had made similar statements on other occasions, he does not specify when the comments were made or what was said. He only makes specific reference to the incident in the Training Academy parking lot. This one incident is not sufficient to establish an adverse action pursuant to the DCHRA. Complainant fails to establish that he suffered an adverse action, and this failure is fatal to his charge of discrimination.

## Respondent Discriminated Against Complainant On The Basis Of His Race (Black) When It Placed Him On A Nine-Day Suspension Without Pay.

For the same reasons already addressed *supra*, Complainant establishes the first two elements of his *prima facie* case.

Complainant meets the third element because he suffered an adverse action when Respondent placed him on 9-days suspension without pay. An adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could conclude that the employee

suffered objectively tangible harm. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742,
761; *Brown v. Brody,* 199 F.3d 446, 457 (D.C. Cir. 1999). Complainant's suspension, by
this definition, is an adverse action since suspension without pay clearly affects the terms,
conditions, or privileges thereof, causing Complainant objectively tangible harm.

Complainant also meets the fourth element of his *prima facie* case – that his race was a
substantial factor in his termination. Both of Complainant's witnesses clearly indicated
that the Captain had told them that Complainant had done nothing wrong on August 6,
2005. Yet, according to evidence in the OHR record – evidence that was provided by
Respondent, it was this same Captain who initiated the adverse action against
Complainant on October 1, 2005.

According to the witnesses, the Captain had indicated that she had to transfer the
Complainant because both he and she were Black, and she feared that if she transferred
Complainant's partner (White) without transferring Complainant, the partner would file
an EEO complaint against her. As already noted, the transfer was not an adverse action.
However, when the Captain, who did not believe that Complainant did anything wrong in
the August 6, 2005 incident, also recommended that he be suspended, and Respondent
suspended him, there is an adverse action.

The OHR is not persuaded by Respondent's proffer that it made a legitimate, non-
discriminatory decision to suspend Complainant because he had not followed its
established protocols. There is evidence in the OHR record that the protocols that
Respondent accused the Complainant of not following were those that pertained to the
crewmember, Complainant's partner, and not to Complainant, the driver.

## CAUSE DETERMINATION

For the foregoing reasons:

The OHR finds **"PROBABLE CAUSE"** to believe that Respondent discriminated
against Complainant on the basis of his race (Black) when it suspended him for nine (9)
calendar days.

## IT IS SO ORDERED.

The Respondent is requested to notify this Office within fifteen (15) days after receipt of
this Determination as to whether said Respondent is prepared to pursue conciliation of
this matter. Otherwise, failure to respond or to respond in the affirmative will result in
this Office processing this case for summary determination or a hearing before an
independent hearing examiner pursuant to Sections 109 and 110 of the District of
Columbia Municipal Regulations Governing Complaints of Discrimination in the District
of Columbia Government. 4 DCMR §§ 109, 110 (2005). Further, all parties are advised
that if conciliation is not accomplished within twenty (20) days from receipt of this letter,
the subject case will be scheduled for summary determination or hearing.

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 11 of 12

## NO CAUSE DETERMINATION

For the foregoing reasons:

The OHR finds **"NO PROBABLE CAUSE"** to believe that Respondent discriminated against Complainant on the basis of his race (Black) when it transferred him from Medic 1 and when a supervisor allegedly threatened him.

## IT IS SO ORDERED.

## RIGHT TO APPLY FOR RECONSIDERATION

Complainant may apply for reconsideration of the No Probable Cause determination pursuant to 4 DCMR § 719. The application, along with all supporting documentation, must be submitted in writing to the Director of the Office of Human Rights within fifteen (15) calendar days from the date of this letter.

Complainant may apply for reconsideration on the grounds of newly discovered evidence, misapplication of laws, or misstatement of material facts. The request must be based on one or more of these grounds. Newly discovered evidence is evidence that: (a) is competent, relevant, and material; (b) was not reasonably discoverable before the issuance of this Letter of Determination; and (c) would alter the ultimate outcome in this case. The application for reconsideration may be dismissed if the application: (a) is not based on one of the above grounds; or (b) is not timely filed. **COMPLAINANT MUST INCLUDE ALL SUPPORTING DOCUMENTATION AND REASONS FOR THE RECONSIDERATION REQUEST IN THE ORIGINAL APPLICATION FOR RECONSIDERATION**. The OHR may forward a copy of any application for reconsideration, along with all supporting documentation, to the other party for a response.

Pursuant to Agency Rule 1 of Section XV of the Rules of Civil Procedure for the Superior Court of the District of Columbia, Complainant has thirty (30) days from the date of this Letter of Determination to file a Petition for Review with Superior Court of the District of Columbia. Failure to apply for reconsideration does not prevent this appeal.

## RIGHT TO SUBSTANTIAL WEIGHT REVIEW

As a Complainant you have the right to a "Substantial Weight Review" from the U.S. Equal Employment Opportunity Commission (EEOC). To obtain a Substantial Weight Review, you must within fifteen (15) calendar days, send your written request to: State

*Anthony Bouknight v. DC Fire & EMS*
Docket No.: 06-073-DC(CN)
EEOC No.: 10CA600065
Page 12 of 12

and Local Coordinator, EEOC, 1801 L Street, N.W., Second Floor, Washington, D.C.
20005.

Sincerely,

Kenneth L. Saunders
Director

cc:    Dietria Liles-Hutchinson
       EEO Officer
       DC Fire & EMS
       1423 Vermont Avenue, NW
       Washington, D.C. 20001

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **ANTHONY BOUKNIGHT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 06-2118 (RMU)** |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** | ) | |
| **(D.C. FIRE and EMS DEPARTMENT)** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER DENYING DISTRICT OF COLUMBIA'S MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT

Upon consideration of the foregoing Opposition to Defendant District of Columbia's Motion to Dismiss or Alternatively for Summary Judgment, the information contained therein, and the record herein, it is this _____ day of _____, 2007,

**ORDERED** that Defendant District of Columbia's Motion to Dismiss or Alternatively for Summary Judgment be and hereby is **DENIED**.

**SO ORDERED**.


_____
JUDGE RICARDO M. URBINA
United States District Court, for the District of
Columbia

Copies to:

Donna Williams Rucker, Esquire
Via electronic filing

James H. Vricos, Esquire
Via electronic filing