**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANTHONY BOUKNIGHT,                    :
                                      :
            Plaintiff,                :        Civil Action No.:      06-2118 (RMU)
                                      :
      v.                              :        Re Document Nos.: 28, 32
                                      :
DISTRICT OF COLUMBIA,                 :
                                      :
            Defendant.                :

<u>**MEMORANDUM OPINION**</u>

**G**RANTING IN **P**ART AND **D**ENYING IN **P**ART THE **D**EFENDANT'S **M**OTION **F**OR
**S**UMMARY **J**UDGMENT; **G**RANTING THE **D**EFENDANT'S **S**UPPLEMENTAL
**M**OTION FOR **S**UMMARY **J**UDGMENT

**I.  INTRODUCTION**

This matter is before the court on the defendant's motion for summary judgment and

supplemental motion for summary judgment.  The plaintiff, an African-American paramedic

employed by the D.C. Fire and Emergency Medical Services ("EMS") Department, alleges that

the defendant took unwarranted punitive actions against him and subjected him to a hostile work

environment based on his race, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e *et seq*., the District of Columbia Human Rights Act ("DCHRA"),

D.C. Code §§ 2-1401 *et seq.*, and 42 U.S.C. § 1981 ("§ 1981").  In its motion for summary

judgment, the defendant argues that the court should grant it summary judgment on the

plaintiff's disparate treatment claims because the plaintiff has failed to raise an inference of

discrimination, did not suffer an adverse employment action and has failed to rebut the

defendant's legitimate, non-discriminatory justification for the challenged actions.  In its

supplemental motion for summary judgment, the defendant argues that the plaintiff has failed to

raise a genuine issue of material fact concerning whether he was subjected to a hostile work

environment.  For the reasons discussed below, the court grants in part and denies in part the

defendant's motion for summary judgment and grants the defendant's supplemental motion for

summary judgment.

## II.   FACTUAL & PROCEDURAL BACKGROUND

The plaintiff has been employed as a paramedic by the D.C. Fire and EMS Department

since December 1991.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 2.  On the

evening of August 6, 2005, the plaintiff and his partner, paramedic Matthew Shook, were

dispatched to the Marriot Convention Center at Georgetown University in response to an

emergency call.  *Id*.; Def.'s Mot. for Summ. J. ("Defs.' Mot.") at 4.  Shook, who is white, was

responsible for providing patient care while the plaintiff drove the ambulance to and from the

scene.  Pl.'s Opp'n at 2-3.  The plaintiff transported the patient and her mother to Georgetown

University Hospital.  *Id*. at 3.

On August 22, 2005, EMS received a letter of complaint from the mother of the patient

transported on August 6, 2005.  Pl.'s Opp'n, Ex. D at 1.  According to the letter, the patient's

mother had made the emergency call on August 6 because her daughter, who suffered from Type

1 diabetes, had inadvertently given herself a potentially fatal dose of insulin.  *Id*. at 1.  The letter

stated that when the paramedics arrived, they seemed confused as to why they were called,

pointing out that the Marriot Convention Center was within walking distance of the hospital.  *Id*.

The letter alleged that during the drive to the hospital, one of the paramedics complained that

they "had to drive all the way across town for this" and suggested that the patient should have

simply walked to the hospital.  *Id*.  The letter further alleged that the paramedics chose not to

write up an incident report, trivializing the patient's ordeal.  *Id*.

On the day the complaint was received, the plaintiff and Shook were instructed to report to the office of their supervisor, Captain Hattie Tompkins, who is African-American. At that time, they learned of the complaint lodged against them. Pl.'s Opp'n at 3. On August 30, 2005, the plaintiff was again called into Captain Tompkins's office. *Id*. at 4. The plaintiff was informed that effective September 4, 2005, he and Shook would be transferred from their assignment on the "Medic 1" unit and sent to separate units pending an investigation into the allegations raised in the complaint.[1] *Id*.

The plaintiff states that approximately one week later, Captain Tompkins informed him that although he had done nothing wrong in connection with the August 6, 2005 run, he was being transferred to avoid the appearance of racial discrimination. *Id*. More specifically, Captain Tompkins allegedly stated that because she and the plaintiff are black while Shook is white, she felt compelled to discipline the plaintiff to avoid the appearance of race-based preferential treatment that could give rise to a discrimination complaint. *Id*. The plaintiff, who maintained that he did nothing wrong in connection with the August 6, 2005 run, objected to the transfer and requested that no action be taken against him. *Id*.

On October 1, 2005, Captain Tompkins recommended that the plaintiff and Shook be suspended from work without pay for ten days based on the August 6, 2005 incident. Def.'s Mot., Ex. E. Tompkins concluded that based on her investigation, the plaintiff and Shook violated patient-care protocols by, *inter alia*, failing to take the patient's vital signs, failing to make a patient assessment, providing false documentation and acting in a discourteous manner to the patient and her mother. *Id*. Captain Tompkins stated that "[t]he casualness, by which these

---

[1]     The plaintiff asserts that although he requested that a union representative be present during the August 30, 2005 meeting, Captain Tompkins and another supervisor informed him that no union representative was needed and that no disciplinary action would be taken as a result of anything discussed on August 30, 2005. Pl.'s Opp'n at 4.

primary duties and responsibilities were not carried out, [was] unacceptable and inexcusable under any standard of conduct" and compelled her to charge the plaintiff and Shook with failing to perform their duties as paramedics.  *Id*.

On November 15, 2005, the Fire and EMS Department issued a notice advising the plaintiff of its intention to suspend him for at least fifteen days without pay based on the August 6, 2005 run.  Pl.'s Opp'n, Ex. F. ("Advance Notice") at 1.  The Advance Notice stated that the plaintiff violated the General Patient Care Protocols ("the Protocols") by failing to take the patient's vital signs, test the patient's blood to determine whether her blood sugar was normal, perform a patient assessment, complete a patient care report or provide the triage nurse at the hospital emergency room with a copy of the patient care report.  *Id*. at 2.  Failure to complete the patient care report and provide the report to the triage nurse constituted specific violations of General Patient Care Protocol A1.7 No. XI ("Transfer of Care and Documentation").  Def.'s Mot. at 5.  That protocol provides that "upon arrival at the medical facility[,] transfer of care will be conducted and the run sheet must be completed.  The patient care report is not considered complete until both the patient care sheet and the data entry sheet are filled out in their entirety."  *Id*.

The Advance Notice addressed the plaintiff's assertion that he was the driver and not directly responsible for administering patient care, noting that "[t]he fact that you were the driver does not alleviate you from your responsibilities."  Advance Notice at 2.  The Advance Notice cited General Patient Care Protocol A1.5, which provided that "the provider with the highest level of pre-hospital training and seniority" – in this case, the plaintiff – "will be in charge of patient care."  *Id*.

On January 18, 2006, the Fire and EMS Department issued a Final Agency Decision. Pl.'s Opp'n at 4-5 & Ex. E ("Final Agency Decision") at 1-3; Def.'s Mot. at 5. The decision ordered that the plaintiff be suspended for nine calendar days without pay for failing to follow patient-care protocols, as set forth in the Advance Notice. Final Agency Decision at 1-3; Def.'s Mot. at 5.

In December 2005, the plaintiff filed a complaint of racial discrimination with the District of Columbia Office of Human Rights ("OHR"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Opp'n at 5. On June 13, 2006, the OHR issued a letter of determination, finding probable cause to believe that the defendant had discriminated against the plaintiff on the basis of his race by placing him on the nine-day suspension, but concluding that the plaintiff's transfer from the Medic 1 unit did not constitute a sufficiently adverse employment action. Pl.'s Opp'n, Ex. G ("OHR Decision") at 5-7. The OHR further determined that the plaintiff had failed to establish that he had suffered an adverse employment action when one of his lieutenants allegedly directed a racially derogatory remark at him.[2] *Id*. at 9.

The plaintiff commenced this action on December 13, 2006. *See generally* Compl. On January 26, 2007, the plaintiff filed an amended complaint, alleging that he was subjected to disparate treatment and a hostile work environment on the basis of his race in violation of Title

---

[2]     In an incident apparently unrelated to the August 6, 2005 run, the plaintiff alleges that one of his supervisors, Lieutenant Mike Baker, charged the plaintiff with insubordination after he questioned one of Lieutenant Baker's orders. 2d Am. Compl. ¶¶ 27-30. Following an investigation, the charge of insubordination was dropped. *Id*. ¶ 31. Subsequently, in May 2006, Lieutenant Baker allegedly stated to the plaintiff, while the two men were in a parking lot, "something to the effect of 'you might think [it's] over but I'm going to get your Black A-s out of here.'" *Id*. ¶ 32. The plaintiff allegedly reported the incident to management, who refused to take disciplinary action against the lieutenant. *Id*. ¶¶ 33-35.

VII, Section 1981 and the DCHRA.[3]  *See generally* Am. Compl.  The defendant moved to dismiss the amended complaint on March 5, 2007.  *See generally* Am. Compl.; Def.'s Mot. to Dismiss.  The court denied the defendant's motion without prejudice and ordered the plaintiff to provide greater factual specificity in support of his claims.  *See generally* Mem. Op. (Mar. 10, 2008).  On March 24, 2008, the plaintiff filed a second amended complaint asserting a single count of racial discrimination.  *See generally* 2d Am. Compl.  The defendant, interpreting the plaintiff's complaint as asserting a single count of disparate treatment, filed a motion for summary judgment on that claim.  *See generally* Def.'s Mot.

On October 20, 2009, the parties held a conference call with the court, in which plaintiff's counsel indicated that the plaintiff had intended for his second amended complaint to encompass a hostile work environment claim.  *See* Minute Order (Oct. 20, 2009).  In addition, plaintiff's counsel indicated that the plaintiff intended to withdraw certain allegations in the second amended complaint related to his hostile work environment claim because he had not yet exhausted his administrative remedies with respect to those claims.  *See id*.  Accordingly, the court directed the plaintiff to file a notice specifying which allegations in the second amended complaint he intended to withdraw.  *Id*.  The court also ordered the defendant to file any supplemental motion for summary judgment pertaining solely to the plaintiff's hostile work environment claim on or before November 13, 2009.  *Id*.

On October 23, 2009, the plaintiff withdrew the allegations contained in paragraphs twenty-nine through thirty-one, thirty-six through forty and forty-two through forty-six of the second amended complaint.  *See* Notice of Withdrawal of Allegations ¶ 4.  On November 12,

---

[3]    The amended complaint also asserted intentional infliction of emotional distress, negligence and negligent hiring and supervision.  *See* Am. Compl. ¶¶ 43-60.  The plaintiff voluntarily withdrew these claims on March 16, 2007.  *See* Mem. Op. (Mar. 10, 2008) at 2 n.1.

2009, the defendant filed a supplemental motion for summary judgment, requesting that the court

enter summary judgment against the plaintiff on his hostile work environment claim.  *See*

*generally* Defs.' Supp. Mot. for Summ. J. ("Def.'s Supp. Mot.").  Both that motion and the

defendant's earlier motion for summary judgment are now ripe.  The court now turns to the

applicable legal standards and the parties' arguments.


## III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540

(D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive

law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

"genuine issue" is one whose resolution could establish an element of a claim or defense and,

therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to

the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

## B. The Court Grants in Part and Denies in Part the Defendant's Motion for Summary Judgment on the Plaintiff's Disparate Treatment Claims

### 1. Legal Standard for Disparate Treatment on the Basis of Race

Generally, to prevail on a claim of discrimination under Title VII, a plaintiff must follow a three-part burden-shifting analysis known as the McDonnell Douglas framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" . . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity

to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted)

(quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).[4]

To establish a prima facie case of race discrimination under Title VII, the plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003); *Carroll v. England*, 321 F. Supp. 2d 58, 68 (D.D.C. 2004). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253. If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee. *Id*. at 254. To rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for its action. *Id*. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id*. Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful

---

[4]     "The standards and order of proof in section 1981 cases have been held to be identical to those governing Title VII disparate treatment cases." *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1413 n.7 (D.C. Cir. 1988) (citing *Carter v. Duncan-Huggins, Inc.*, 727 F.2d 1225 (D.C. Cir. 1984)). The McDonnell Douglas framework also applies to claims under the DCHRA. *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868-69 & n.3 (D.C. 1997) (noting that the D.C. Court of Appeals "looks to federal statutes and case law for guidance in deciding cases under the [DCHRA]"); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986) (noting that "[i]n an employment discrimination case where disparate treatment is alleged, this court has adopted the Supreme Court's approach with respect to the allocation of the burdens of proof under Title VII of the Civil Rights Act of 1964").

discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the McDonnell Douglas framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Lathram*, 336 F.3d at 1088 (internal citations omitted); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow"). The district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494 (D.C. Cir. 2008). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case. *Id.* at 1291.

### 2. The Court Grants Summary Judgment to the Defendant on the Plaintiff's Claim Concerning His Transfer from the Medic 1 Unit

The defendant contends that the plaintiff's transfer from the Medic 1 unit did not constitute an adverse employment action because it was a purely lateral transfer that did not affect the terms or conditions of his employment. Def.'s Mot. at 10-11. The defendant asserts

that the plaintiff has presented no evidence that his reassignment from Medic 1 to another unit resulted in any diminution in pay or benefits or had any other materially adverse consequences. *Id*. In addition, the defendant states that the plaintiff's current work responsibilities are identical to the responsibilities he had before the transfer. *Id*. at 11.

The plaintiff maintains that the transfer "significantly impacted [him] in the fact that the hours substantially changed" and "caused a great amount of stress and inconvenience because the shift change upset the family schedule." Pl.'s Opp'n at 10-11. He also claims that "the transfer affected overtime potential." *Id*. The plaintiff, however, has offered no evidence to substantiate these assertions.[5] *See id*.

This Circuit has held that

> a plaintiff who is made to undertake or who is denied a lateral transfer – that is, one in which she suffers no diminution in pay or benefits – does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere [idiosyncrasies] of personal preference are not sufficient to state an injury.

*Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). Although "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation are not adverse actions . . . reassignment with significantly different responsibilities . . . or a significant change in benefits generally indicates an adverse action." *Forkko v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) (internal citations and quotation marks omitted).

Lateral reassignment that significantly alters an employee's schedule may, under certain circumstances, constitute an adverse employment action. *See Ginger v. District of Columbia*, 527 F.3d 1340, 1343-44 (D.C. Cir. 2008) (holding that the plaintiffs' transfer from a permanent

---

[5]   As the court noted in its March 10, 2008 memorandum opinion denying the defendant's motion to dismiss, the plaintiff's complaint is silent as to the nature and consequences of the plaintiff's transfer. *See* Mem. Op. (Mar. 10, 2008) at 8.

shift schedule to a rotating shift schedule constituted an adverse employment action). In *Ginger*, the Circuit reversed the district court's determination that the plaintiff's transfer from a permanent shift schedule to a rotating shift schedule was not an adverse employment action because it did not change the employees' responsibilities or cause a substantial change in their benefits. *Id*. at 1343. The Circuit observed that the reorganization resulted in lost income, affected the plaintiffs' sleep schedules and made it more difficult for them to work overtime and part-time day jobs. *Id*. at 1344. The Circuit concluded that because the employees "were paid less for working a substantially more difficult schedule," the transfer constituted an adverse employment action. *Id*.

The plaintiff in this case contends that like the plaintiffs in *Ginger*, his transfer from the Medic 1 unit caused him substantial inconvenience and denied him opportunities to earn overtime. *See* Pl.'s Opp'n at 11. The plaintiff, however, has offered no evidence whatsoever to substantiate these conclusory allegations of inconvenience and financial loss. *See id*. at 10-11. Indeed, the plaintiff has failed to describe in any detail the nature of the transfer and how it affected his hours, his wages, his responsibilities or any of the terms and conditions of his employment. *See id*. The plaintiff's unsupported, conclusory allegations of inconvenience and lost income are insufficient to withstand summary judgment. *See Ginger*, 527 F.3d at 1346-47 (observing that "a mere unsubstantiated allegation . . . creates no 'genuine issue of fact' and will not withstand summary judgment") (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (noting that accepting patently conclusory allegations as true "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial"). Accordingly, because the plaintiff has not raised a genuine issue of material fact as

to whether his transfer from the Medic 1 unit was an adverse employment action, the court grants summary judgment to the defendant on this claim.

### 3. The Court Denies Summary Judgment to the Defendant on the Plaintiff's Claims Concerning His Suspension Without Pay

The defendant asserts that the plaintiff was suspended for violating established patient-care protocols during the August 6, 2005 run by failing to take the patient's vital signs, test the patient's blood sugar, make a patient assessment, complete a patient care report or leave a copy of a patient care report with the triage nurse in the emergency room. Def.'s Mot. at 13; *see* Advance Notice at 2. The defendant maintains that the plaintiff was the senior paramedic during the August 6, 2005 run and, as such, was independently responsible for these violations of the patient-care protocols. *Id*. at 13; Advance Notice at 2. The defendant contends that the plaintiff has failed to rebut this legitimate, non-discriminatory justification for his nine-day suspension without pay. *See* Def.'s Mot. at 12-14; Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") at 3-5. In addition, the defendant argues that the fact that Shook received identical discipline undermines any inference of racial discrimination. *Id*. at 9.

The plaintiff responds that there exists a genuine issue of material fact as to whether the defendant's proffered legitimate, nondiscriminatory justification was a pretext for racial discrimination. *See* Pl.'s Opp'n at 9. He maintains that adherence to the patient-care protocols violated during the August 6, 2005 run was the responsibility of Shook rather than the plaintiff, who drove the ambulance, was not directly responsible for providing patient care and did not interact with the patient or her mother. *Id*. at 3 & Ex. H. Furthermore, the plaintiff contends that Captain Tompkins informed him that although he had done nothing wrong, he was being transferred because he was black. *Id*. The plaintiff offers letters from three coworkers, including his union shop steward, in which they claim that they overheard Captain Tompkins state that the

plaintiff was transferred from Medic 1 to avoid the appearance of racial discrimination.  *See* Pl.'s Opp'n at 9.

Based on the evidence offered by the parties, it appears that there were two bodies of rules and procedures governing the activities of paramedics employed by the defendant: the Protocols, cited in the Advance Notice and Final Agency Decision; and the Fire and EMS General Order Book ("the Order Book").  *See* Pl.'s Opp'n at 10; *see also* OHR Decision at 9.  As noted in the OHR Decision, the plaintiff's union shop steward stated that although the defendant often cited the Protocols when formally charging an employee with misconduct, "it was the 'Order Book' that dictated actual day to day operational procedures" and that the chief of the department "had clearly stated that he expected the procedures in the Order Book to be followed by ambulance crews."  OHR Decision at 9 n.7.

Article XXIV of the Order Book delineated the responsibilities of the "Driver" and the "Crewmember."  Pl.'s Opp'n, Ex. L.  The "Driver" was responsible for maintaining the vehicle, including checking the exterior vehicle compartments for accountable equipment, checking for any exterior body damage, checking the electrical system including warning lights, sirens and radios, checking vehicle fluid levels and checking equipment and Medical Supply lockers following of the replenishment of supplies on the unit.  *Id*.  By contrast, the responsibilities of the "Crewmember" included:

- "Mak[ing] journal entry of members assuming duty with all appropriate equipment;"

- "Mak[ing] the journal entries of *all assigned incidents*;"

- "Ensur[ing] that the executed EMS 151-c Run Sheets are delivered to the appropriate drop site;" and

- "Document[ing] the findings of the inspection in the unit journal and associated sections of the FD Forms 54.2 AMB and 54.3."

*Id.*

Also, as noted in the OHR Decision, Article XXIV provided that the "Crewmember" was responsible for all aspects of patient care, including:

- "Stay[ing] with the patient from the initial on-scene contact to release at the hospital;"

- "Obtain[ing] patient history and pertinent information from patient, family and/or bystanders at the scene;"

- "Determin[ing] how the patient will be treated and transported;"

- "Administer[ing] medications, as needed;" and

- "Reassess[ing] the patient's condition prior to and during transport."

OHR Decision at 9 (quoting Article XXIV of the Order Book).

Thus, the Order Book suggests that Shook, the "Crewmember" during the August 6, 2005 run, was responsible for assessing the patient's condition, administering patient care and filling out the run sheets regarding the incident. *See* Pl.'s Opp'n, Ex. L; OHR Decision at 9. These provisions support the plaintiff's assertion that Shook – not the plaintiff – was responsible for the violations that led to the plaintiff's suspension.

The defendant, citing the Protocols, asserts that the plaintiff was independently responsible for patient care as the senior paramedic during the run. *See* Def.'s Mot. at 12-14. Yet, as previously noted, the plaintiff has offered evidence that Order Book, rather than the Protocols, actually dictated the daily procedures and responsibilities of drivers and crewmembers. *See* OHR Decision at 9 n.7. The extent to which the Protocols and the Order Book actually governed the day-to-day operations of paramedics and informed disciplinary decisions is a question of fact whose adjudication would be inappropriate at this stage of the litigation. *See Jones v. Bernanke*, 557 F.3d 670, 681 (D.C. Cir. 2009) (noting that the court must

"refrain from making credibility determinations, weighing the evidence, or drawing inferences from the evidence [as] these, after all, are jury functions, not those of a judge ruling on summary judgment"); *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (observing that in resolving a motion for summary judgment, the court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence").

Furthermore, the plaintiff has offered evidence that his race was a motivating factor in Captain Tompkins's decision to discipline him.  *See* Pl.'s Opp'n at 9.  The plaintiff's union shop steward states that when he spoke to Captain Tompkins about the plaintiff's transfer, "she stated that he was not going back to that unit because 'she was not going to deal with that racial mess' and that if she moved [the plaintiff] back Paramedic Shook would file a discrimination complaint even though she agreed that [the plaintiff] had done nothing wrong."  Pl.'s Opp'n, Ex. J.  Another coworker states that she overheard Captain Tompkins state during a telephone conversation that "she was scared that if she sent [the plaintiff] back to medic 1 Paramedic [S]hook would file charges against her."  Pl.'s Opp'n, Ex. I.  Yet another coworker states that Captain Tompkins told her that she knew the plaintiff "didn't do anything wrong but [she] moved him [b]ecause [she] did not want Paramedic Shook to say [she] moved him and not [the

plaintiff] and then have Shook file an EEO complaint."[6]  Pl.'s Opp'n, Ex. K.  Although these statements concerned the plaintiff's transfer rather than his suspension, this evidence indicates that Captain Tompkins believed that the plaintiff had done nothing wrong but chose to hold him accountable for the violations that occurred on August 6, 2005 because of his race.

The defendant asserts that even if Captain Tompkins made the statements alleged, those statements would merely evince a desire to avoid the appearance of a discriminatory preference rather than racial animus.  *See* Def.'s Reply at 2-3.  This assertion, even if true, is of no moment, as the plaintiff has presented evidence that Captain Tompkins recommended that the plaintiff be disciplined expressly because of his race.  *See UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991) (stating "[w]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination"); *Jespersen v. Harrah's Operating Co., Inc.*, 392 F.3d 1076, 1079 (9th Cir. 2004) (holding that "although an employee must prove that the employer acted intentionally" to prevail on a Title VII disparate treatment claim, "the intent need not have been malevolent"); *cf. Ricci v. DeStefano*, 129 S. Ct. 2658, 2673 (2009) (observing that a city's decision not to certify promotional examination results because too many whites and not enough minorities would be promoted violated the disparate treatment prohibitions of Title VII despite

---

[6]     Although the defendant contends that inconsistencies mar these witness statements, *see* Def.'s Reply at 2, the court is barred from making credibility determinations or weighing the evidence at the summary judgment stage.  *See Jones v. Bernanke*, 557 F.3d 670, 681 (D.C. Cir. 2009); *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).  And although the defendant complains that the witness statements fail to comply with all the formalities of formal affidavits, Def.'s Reply at 4 n.2, "a nonmovant is not required to produce evidence in a *form* that would be admissible at trial" so long as the evidence is "capable of being converted into admissible evidence."  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citing FED. R. CIV. P. 56(e)).  The defendant offers nothing to suggest that the content of these statements would be inadmissible at trial.  *See generally* Defs.' Reply; *see also* FED. R. EVID. 801(d)(2) (noting that a statement is not hearsay if it is "offered against a party" and is "the party's own statement, in either an individual or a representative capacity").

the fact that the city took the action based on concerns of potential disparate impact liability).  As the Supreme Court stated in *Ricci*, absent some other justification, "express, race-based decisionmaking violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."  129 S. Ct. at 2673-76 (holding that avoiding disparate-impact liability does not justify race-based disparate treatment unless the employer has a strong basis in evidence to conclude that it will be subject to disparate-impact liability if it fails to take the discriminatory action) (citing 42 U.S.C. § 2000e-2(a)(1)).  Thus, even if Captain Tompkins acted from a benign motive, that fact would not diminish the defendant's liability under Title VII's disparate treatment provisions.

Lastly, the defendant's argument that Shook was treated "in an identical fashion" to the plaintiff is contradicted by the record before the court.  *See* Def.'s Mot. at 9; Def.'s Reply at 3-4. The plaintiff has presented evidence that unlike Shook, he was disciplined despite having done nothing wrong in connection with the August 6, 2005 run.  *See generally* Pl.'s Opp'n.  It goes without saying that punishing the blameworthy and the innocent identically does not constitute equal treatment.

In sum, the plaintiff has raised a genuine issue of fact as to whether the defendant suspended him without pay for nine days because of his race rather than for any failure to perform.  Accordingly, the court denies the defendant's motion for summary judgment with respect to the plaintiff's claim concerning his nine-day suspension without pay.

### C.  The Plaintiff's Hostile Work Environment Claim

### 1.  Legal Standard for Hostile Work Environment

Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion,

sex, or national origin.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Toward that end, an

employer may not create or condone a hostile or abusive work environment that is

discriminatory.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Such an

environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Singletary v. District of Columbia*,

351 F.3d 519, 526 (D.C. Cir 2003) (quoting *Meritor*, 477 U.S. at 65, 67).  On the other hand,

"[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment – an environment that a reasonable person would find hostile or abusive – is beyond

Title VII's purview."  *Harris*, 510 U.S. at 21.  Thus, to determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance.  *Id.* at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998).  In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived)
> disability; and many bosses are harsh, unjust and rude.  It is therefore important in
> hostile work environment cases to exclude from consideration personnel decisions
> that lack a linkage of correlation to the claimed ground of discrimination.
> Otherwise, the federal courts will become a court of personnel appeals

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d

365, 377 (2d Cir. 2002)).

### 2.   The Court Grants Summary Judgment to the Defendant on
### the Plaintiff's Hostile Work Environment Claim

The defendant argues that it is entitled to summary judgment on the plaintiff's hostile

work environment claim because the plaintiff's meager and conclusory allegations are

insufficient to support a hostile work environment claim.  *See generally* Def.'s Supp. Mot.;

Def.'s Reply to Pl.'s Opp'n to Def.'s Supp. Mot. ("Def.'s Supp. Reply").[7]  The plaintiff

maintains that a genuine issue of material fact exists regarding whether the plaintiff suffered

from a hostile work environment.  *See* Pl.'s Opp'n to Def.'s Supp. Mot. ("Pl.'s Supp. Opp'n") at

9-13.[8]

As previously noted, on October 23, 2009, the plaintiff withdrew a substantial number of

allegations in the second amended complaint related to his hostile work environment claim.  *See*

Notice of Withdrawal of Allegations ¶ 4.  As a result, the entirety of the plaintiff's hostile work

environment claim is premised on the following allegations: that the defendant transferred him

out of Medic 1, denied him representation during the August 30, 2005 meeting with Captain

Tompkins, suspended him without pay for nine days, threatened him with disciplinary actions

including leave restrictions, denied him access to his file and "verbally harassed" him.  Pl.'s

Supp. Opp'n at 10-11; *see generally* 2d Am. Compl.  The plaintiff also points to the incident in

which Lieutenant Baker confronted the plaintiff in the parking lot and threatened to have him

"thrown out" for insubordination.  2d Am. Compl.  ¶¶ 27-35.

Most of these allegations of "hostile" treatment, such as his transfer out of Medic 1,

suspension without pay and threats of disciplinary action, simply recast the allegations

underlying the plaintiff's disparate treatment claims.  *See* Pl.'s Opp'n to Def.'s Supp. Mot. at

---

[7]     In its reply, the defendant argues that the plaintiff failed to exhaust his administrative remedies with respect to his hostile work environment claim.  *See* Def.'s Supp. Reply at 2-6.  Because this argument was raised for the first time in the defendant's reply, the court will not consider it in resolving this motion.  *See, e.g.*, *Sloan ex rel. Juergens v. Urban Title Servs., Inc.*, 652 F. Supp. 2d 40, 50 n.8 (D.D.C. 2009) (declining to address arguments raised for the first time in a reply brief).

[8]     The plaintiff also argues that the defendant's supplemental summary judgment motion is procedurally defective because the defendant failed to accompany this filing with a statement of material facts not in dispute, as required by Local Civil Rule 56.1.  *See* Pl.'s Opp'n to Def.'s Supp. Mot. at 5-6.  The court, however, notes that the defendant did submit a Local Civil Rule 56.1 statement in connection with his original motion for summary judgment, which addressed the facts at issue in this supplemental motion.  *See* Def.'s LCvR 56.1 Stmt.  Accordingly, the court declines to strike the defendant's motion for failure to comply with Local Civil Rule 56.1.

10-11.  Courts have disapproved of such efforts to cobble a hostile work environment claim from disparate acts of workplace conflict.  *See Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) (noting that the bulk of the "hostile" events on which the plaintiff relied were the very employment actions he claimed were discriminatory and concluding that a plaintiff "cannot so easily bootstrap discriminatory claims into a hostile work environment claim"); *Lester v. Natsios*, 290 F. Supp. 2d 11, 31-32 (D.D.C. 2003) (noting that "discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim" and that "it is not at all clear that mere reference to alleged disparate acts of discrimination . . . can ever be transformed, without more, into a hostile work environment claim"); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (observing that "[h]ostile work environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct" and "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day").  The plaintiff's allegations "indicate[] less a pervasive pattern of harassment, and more just isolated employment incidents occurring over a long period of time."  *Nurriddin*, 382 F. Supp. 2d at 108; *see also Tolson*, 618 F. Supp. 2d at 21 (holding that five discrete incidents of hostile behavior did not constitute a hostile work environment because there was no evidence in the record to tie any of these sporadic events to one another).

In addition, there is little evidence to suggest that the plaintiff's remaining claims – such as the denial of union representation at one meeting, denial of access to his file and unspecified incidents of verbal harassment –were so pervasive or severe, individually or collectively, as to rise above the level of "ordinary tribulations of the workplace" and constitute "an abusive working environment."  *Faragher*, 524 U.S. at 787-88.  With the possible exception of the plaintiff's confrontation with Lieutenant Baker, none of these incidents reflects the "extreme

conduct" necessary to support a legally cognizable hostile work environment claim.  *See Lester*, 290 F. Supp. 2d at 31 (citing *Faragher*, 524 U.S. at 787-88).  And although the incident involving Lieutenant Baker arguably constituted extreme conduct, a single incident of hostile behavior, standing alone, is not sufficient to create a pervasive hostile work environment.  *Id.* at 32.  Accordingly, the court grants summary judgment to the defendant on the plaintiff's hostile work environment claim.

## IV.  CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the defendant's motion for summary judgment and grants the defendant's supplemental motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 15th day of January, 2010.

RICARDO M. URBINA
United States District Judge